**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| THE CINCINNATI INSURANCE COMPANY,     ) | |
|          ) | |
|          Plaintiff,    ) | |
| v.    ) | |
|    ) | |
| D.W. TOOL, INC. d/b/a WAHLCO    ) | |
| Serve Registered Agent:    ) | |
| Susan P. Layton Tomlin    ) | |
| 2845 Professional Ct.    ) | |
| Cape Girardeau, MO 63703-5035    ) | |
|    ) | |
| and    ) | Case No. |
|    ) | |
| JOHN EGBUKA,    ) | |
| Serve at:    ) | |
| 1213 Morton Street    ) | |
| Jackson, MO 63755    ) | |
|    ) | |
|         Defendants.    ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

The Cincinnati Insurance Company ("Cincinnati"), by and through the undersigned counsel, for its Complaint for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2022, and Fed. R. Civ. P. 47, states as follows:

**NATURE OF THE SUIT**

1.      This is a declaratory judgment action brought pursuant to 28 U.S.C. §§ 2201, 2022, and Fed. R. Civ. P. 57 to determine Cincinnati's and D.W. Tool, Inc. d/b/a Wahlco's ("Wahlco's") rights and obligations under a series of commercial general liability ("CGL") policies that Cincinnati issued to Wahlco.

2.      An actual and justifiable controversy exists between the parties. This action will resolve a dispute as to whether the CGL policies at issue provide insurance coverage to Wahlco in connection with a lawsuit captioned *John Egbuka v. The Procter & Gamble Company, et al.*, Case No. 25CG-CC00336, filed in the Circuit Court of Cape Girardeau County, Missouri ("the Underlying Lawsuit").

## PARTIES, JURISDICTION, AND VENUE

3.      Cincinnati is a corporation incorporated under the laws under the State of Ohio.

4.      Wahlco is a corporation incorporated under the laws of the State of Missouri, having its principal place of business in Jackson, Missouri.

5.      Defendant John Egbuka ("Egbuka") is a resident and citizen of the State of Missouri and is the plaintiff in the Underlying Lawsuit.

6.      The Underlying Lawsuit is a personal injury action in which Egbuka seeks damages allegedly resulting from physical injury.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds seventy-five thousand dollars ($75,000) and there exists complete diversity of citizenship.

8.      The Underlying Lawsuit was filed in Cape Girardeau County, a county falling within this federal district.

9.      The Underlying Lawsuit alleges conduct taking place within this federal district.

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to this lawsuit occurred in this federal district.

## BACKGROUND

11.     On December 1, 2025, Egbuka filed a Petition in the Underlying Lawsuit ("the Underlying Petition"). A true and correct copy of the Underlying Petition is attached as Exhibit A.

12.     Among the defendants named in the Underlying Lawsuit are The Procter & Gamble Company; The Procter & Gamble U.S. Business Service Company (P&G) ; BASF Corporation; Evonik Corporation F/K/A Evonik Degussa Corporation, Successor In Interest And/or F/K/A Stockhausen Louisiana, LLC And/or F/K/A Degussa Corporation And/or F/K/A Evonick Stockhausen, LLC And/or F/K/A Evonik Stockhausen, Inc.,; Nippon Shobukai America Industries, Inc., F/K/A  NA Industries Inc. (collectively referred to as the "P&G Defendants"); and Wahlco (altogether, "the Underlying Defendants").

13.     The Underlying Petition alleges that John Egbuka was employed at the Procter & Gamble Paper Products Company facility in Jackson, Missouri ("Cape Girardeau Plant"), which manufactured diapers for the Procter & Gamble Company from 1998 to 2018. (Ex. A, ¶ 2).

14.     The Underlying Petition alleges that P&G designed, developed, patented, licensed, and/or otherwise introduced into the stream of commerce a product known as absorbent gelling material ("AGM"). AGM was and is currently used in the manufacturing and production of hygiene products such as diapers that were, at all relevant times, manufactured at the Cape Girardeau Plant.

15.     The Underlying Petition alleges that, in the course of his work at the Cape Girardeau Plant, Egbuka was repeatedly and regularly exposed to AGM that was specified, manufactured, processed, imported, recycled, or sold by the Underlying Defendants. (Ex. A, ¶ 3).

16.     The Underlying Petition alleges that Plaintiff's exposure to AGM directly and proximately caused, or contributed to cause, him to develop chronic obstructive lung injury or other lung diseases. (Ex. A, ¶ 3).

17.    The Underlying Petition alleges that Wahlco received waste or rejected diapers from the Procter & Gamble Paper Products Company, processed the waste or rejected diapers using a mechanical process to separate and pulverize the AGM, then sold the AGM-containing material to one or more of the P&G Defendants for use in manufacturing diapers. (Ex. A, ¶¶ 17–19).

18.    The Underlying Petition alleges that inhalation of AGM can cause respiratory disease in humans, including the development of chronic obstructive lung disease and cancer. (Ex. A ¶¶ 51–57).

19.    The Underlying Petition alleges that the AGM suppliers knew, or should have known, the results of a two-year animal study conducted by or on behalf of P&G, that the bags of AGM delivered to the Cape Girardeau Plant included respirable particles, and that inhaled respirable AGM particles could cause injury to the lung. (Ex. A, ¶¶ 60, 68).

20.    The Underlying Petition alleges that AGM was continuously released in the area around Egbuka at the Cape Girardeau Plant, and that he was diagnosed with chronic obstructive lung disease on or after June 16, 2023, when the character of his condition of chronic obstructive lung disease came together with the cause of inhalation exposure to AGM dust while employed at the Cape Girardeau Plant. (Ex. A, ¶¶ 90, 91)

21.    The Underlying Petition alleges that the exposure to AGM caused, or contributed to cause, Egbuka to be at an increased risk for development of cancer, that the Underlying Defendants knew, or should have known, of the hazardous nature of AGM when the products were designed, manufactured, distributed or sold, and that Egbuka would be exposed to the products while working at the Cape Girardeau Plant. (Ex. A, ¶ 94)

22.    The Underlying Petition contains six counts. Four of the six counts are brought against Wahlco.

23.     Count I, styled as Strict Liability in Tort – Design Defect, is brought against Wahlco. (Ex. A, ¶¶ 95-102).

24.     Count I alleges that Wahlco designed, developed, licensed, manufactured and/or sold AGM products or mechanically processed AGM products. (Ex. A., ¶ 96).

25.     Count I alleges that, when the AGM products at issue were used in the Cape Girardeau Plant, they were in a defective condition, were unreasonably dangerous, were respirable, and would cause respiratory disease in humans exposed to the product through inhalation. (Ex. A. ¶ 98).

26.     Count I alleges that the unreasonably dangerous condition of the AGM products at issue caused or contributed to cause Egbuka's lung disease. (Ex. A., ¶ 100).

27.     Count II is styled as Strict Liability – Failure to Warn, and is directed at Wahlco.

28.     Count II alleges that Wahlco designed, developed, licensed, manufactured, distributed, marketed, sold and/or supplied AGM products or mechanically processed AGM products without adequate instructions on safe use to reduce and/or eliminate exposure thereto, and without warnings that the AGM products at issue were dangerous to health and could cause respiratory and lung diseases. (Ex. A., ¶ 104).

29.     Count II alleges that as a result of Wahlco's failure to warn, the AGM products at issue were defective and unreasonably dangerous when put to use, and as a result, Egbuka was exposed to the AGM products at issue, which caused or contributed to cause his illness. (Ex. A. ¶¶ 105,106).

30.     Count III is styled Negligent Design, Manufacturing, & Testing, and is directed at Wahlco.

31.    Count III alleges generally that Wahlco owed a duty to exercise care, skill, and competence of similarly situated parties to acquire the skill and knowledge to test for hazards and defects and manufacture products that are from defects and hazards. (Ex. A., ¶110).

32.    Count III alleges Wahlco breached this duty by, among other things, designing, developing, licensing, manufacturing and/or selling AGM products that contained respirable particles; that cause respiratory disease; without testing the product for defects or hazards; without warning without testing the product for harm to users. (Ex. A., ¶ 111).

33.    Count III alleges that as a result of this breach, Egbuka was exposed to harmful AGM products, which caused or contributed to cause physical, emotional, and financial injuries and damages. (Ex, A, ¶ 112–115).

34.    Count IV is styled Negligent Failure to Warn and is directed at Wahlco.

35.    Count IV alleges Wahlco had a duty to exercise reasonable care including a duty to warn of defects and/or hazards in their product, and that Wahlco breached this duty by, among other things, failing to warn of defects and/or hazards in the AGM products at issue; failing to warn of the risk or respiratory disease to those using the AGM products at issue; failing to provide adequate instruction for the safe use of AGM products in the manufacture of diapers. (Ex. A., ¶ 118).

36.    Count IV alleges Wahlco breached its duty of care and was negligent, and as a result of its negligence, Egbuka suffered physical and emotional injuries, and financial damages.

## THE CINCINNATI POLICIES

37.    Wahlco has requested that Cincinnati provide it with defense and indemnity in connection with the Underlying Lawsuit pursuant to Policy No. EPP 067 34 42.

38.    The initial period of Policy No. EPP 067 34 42 was from 12/31/2022 to 12/31/2023. It was renewed annually with policy periods of 12/31/2023 to 12/31/2024,

12/31/2024 to 12/31/2025, and 12/31/2025 to 12/31/2026. The applicable policy forms from each policy period are attached and incorporated as if set forth herein as Exhibits B, C, D, and E, respectively (collectively, "the Cincinnati Policies").

39.    The coverage provided by the Cincinnati Policies is subject to the Cincinnati Policies' terms, conditions, endorsements, limitations, and exclusions.

40.    The Cincinnati Policies contain the following insuring agreement, in most relevant part:

**SECTION I - COVERAGES COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.  Insuring Agreement**

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or" property damage" to which this insurance applies.

41.    The Cincinnati Policies also contain the following exclusion ("the Pollution Exclusion"), in most relevant part:

This insurance does not apply to:

**f.      Pollution**

    **1)**  "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

        a.  At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured….

        b.  At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

        c.  Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:
            i.    Any insured; or
            ii.   Any person or organization for whom you may be legally responsible; or

7

d. At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

42. Cincinnati also issued Commercial Umbrella Liability insurance policies to Wahlco, Policy No. EPP 067 34 42 ("the Excess Policies"), with policy periods identical to the underlying Cincinnati Policies.

43. The Excess Policies' insuring agreement provides, in relevant part:

1. We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies…

44. The Excess Policies contain an exclusion titled "Pollutant – Other than Auto", which provides, in relevant part:

This insurance does not apply to:

a. "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

1. At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured….
2. At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
3. Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:
4. At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

45.     The Cincinnati Policies contain the following definition of "pollutant", as modified by endorsement GA 4531 09 20:

> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum byproducts, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether the injury or damage is caused directly or indirectly by the "pollutants" and whether:
>
> a.  The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or
> b.  The insured uses, generates or produces the "pollutants".

46.     The Cincinnati Policies contain the following definition of "pollutant", as modified by endorsement GA 4531 09 20:

> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum byproducts, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether the injury or damage is caused directly or indirectly by the "pollutants" and whether:
>
> a.  The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or
> b.  The insured uses, generates or produces the "pollutants".

47.     The Cincinnati Policies and Excess Policies contain the following endorsements, XS 443 MO 08 08 and XS 328 MO 12 07:

> This Pollutant Exclusion applies even if such irritant or contaminant has a function in your business, operations, premises, site or location.

### COUNT I: DECLARATORY JUDGMENT

48.     Paragraphs 1 through 47 are hereby incorporated by reference.

49.     The Cincinnati Policies' Pollution Exclusion and Excess Policies "Pollutant – Other than Auto" (collectively, "the Pollution Exclusion") bar coverage for "bodily injury" or "property damage" arising out of the discharge, dispersal, migration, release, escape, or emission of pollutants that were transported, handled, stored, treated, disposed of, or processed as waste by or for any insured.

50.     AGM, functioning as alleged in the Underlying Petition, qualifies as a "pollutant" under the definition contained in the Cincinnati Policies and Excess Policies.

51.     The Underlying Petition alleges that Wahlco transported, handled, stored, treated, disposed, and/or processed AGM.

52.     In the Underlying Lawsuit, Egbuka seeks damages from Wahlco for bodily injury that arose from the discharge, dispersal, seepage, migration, release, or escape of AGM, a pollutant, that Wahlco allegedly transported, handled, stored, treated, disposed of, and/or processed as waste. Specifically, Egbuka alleges he inhaled AGM that had been previously processed and handled by Wahlco during his work at the Cape Girardeau Plant.

53.     The Pollution Exclusion applies to all allegations asserted by Egbuka against Wahlco asserted in the Underlying Lawsuit and relieves Cincinnati of any obligation to provide indemnity, defense, or other insurance coverage to Wahlco pursuant to the Cincinnati Policies or Excess Policies in connection with the Underlying Lawsuit.

54.     Cincinnati has complied with all terms, conditions, and provisions of the Cincinnati Policies and Excess Policies.

55.     This matter is ripe because there is a dispute regarding Cincinnati's exposure or duties in the settlement and/or adjudication of the Underlying Lawsuit.

56.     By virtue of the foregoing, a declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations, and liabilities that exist between the parties in connection with the aforementioned Cincinnati Policies and Excess Policies.

WHEREFORE, Plaintiff The Cincinnati Insurance Company prays that this Court enter judgment in its favor and against the Defendants, declaring:

A.      That The Cincinnati Insurance Company had/has no duty to defend D.W. Tool, Inc. d/b/a Wahlco pursuant to the Cincinnati Policies or Excess Policies with respect to any claims asserted or that could have been asserted in the Underlying Lawsuit, or the losses claimed therein;

B.      That The Cincinnati Insurance Company has no duty to indemnify or provide any other coverage to D.W. Tool, Inc. d/b/a Wahlco with respect to any claims, loss, or damages in the Underlying Lawsuit, pursuant to the Cincinnati Policies or Excess Policies;

C.      That The Cincinnati Insurance Company has no duty to contribute any manner or amount to any settlement or proposed settlement of the Underlying Lawsuit pursuant to the Cincinnati Policies or Excess Policies; and

D.      For such other and further relief as the Court deems just, proper, and equitable.

## JURY TRIAL DEMAND

57.     Pursuant to Fed. R. Civ. P. 38(b) Cincinnati hereby demands that this case be tried by a jury.

Respectfully Submitted,

**LITCHFIELD CAVO, LLP**

/s/ *Blaine P. Smith*
Blaine Smith   MO #74504
10401 Holmes Road, Suite 220
Kansas City, MO 64131
816-648-1400
816-648-1401 Fax
smithb@litchfieldcavo.com

**ATTORNEYS FOR PLAINTIFF
THE CINCINNATI INSURANCE
COMPANY**